IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


ALFREDO G. SANCHEZ,
   Petitioner,

vs.            Case No.:  3:14cv249/LAC/EMT

JULIE L. JONES,
   Respondent.
_____/

## REPORT AND RECOMMENDATION

   This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 22).  The court provided Petitioner an opportunity to file a reply (ECF No. 24), but he has not done so.

   The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

## I.  BACKGROUND AND PROCEDURAL HISTORY

   The relevant aspects of the procedural background of this case are established by the state court record (ECF No. 22).[1]  On October 14, 2005, Petitioner was charged in the Circuit Court in

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 22).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

and for Escambia County, Florida, Case No. 2005-CF-5405, with one count of unlawful sexual activity with a minor (the information alleged that the offense occurred between October 1, 2002, and September 7, 2003) (Ex. A at 1). On December 14, 2005, Petitioner was charged in Case No. 2005-CF-6346, with one count of lewd or lascivious battery (victim over 12 but under 16 years of age) (Count 1) and one count of lewd or lascivious molestation (Count 2) (the information alleged that both offenses occurred between May 1, 2001, and September 27, 2001). Petitioner entered a written agreement with the State, pursuant to which Petitioner agreed to enter a "straight up" plea of nolo contendere to the charges, with no recommendation from the State regarding his sentence (*id.* at 15–19). By signing the agreement, Petitioner agreed that the factual basis for each plea was set forth in the arrest reports, which were part of the court file and incorporated into the agreement (*id.*). On November 29, 2006, Petitioner was sentenced to fifteen (15) years in prison, with pre-sentence jail credit of 329 days, in Case No. 2005-CF-5405 (*id.* at 20–27). In Case No. 2005-CF-6346, he was sentenced on Count 1 to fifteen (15) years in prison, with pre-sentence jail credit of 373 days, to run consecutively to the sentence in Case No. 2005-CF-5405 (*id.*). On Count 2, he was sentenced to  to fifteen (15) years in prison, to run consecutively to the sentence on Count 1 and consecutively to the sentence in Case No. 2005-CF-5405 (*id.*).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-6562 (*see* Progress Docket Report). The First DCA affirmed the judgment on April 20, 2010 (*see* Ex. A at 57–62). Sanchez v. State, 33 So. 3d 753 (Fla. 1st DCA 2010).

On or about June 30, 2010, Petitioner filed a motion for reduction or modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (*see* Progress Docket Report). The state circuit court summarily denied the motion in an order rendered July 30, 2010 (*see id.*).

On January 11, 2011, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. A at 30–45). In an order rendered February 8, 2011, the state circuit court dismissed the motion as procedurally defective (*id.* at 63).

On February 16, 2011, Petitioner filed another Rule 3.850 motion (Ex. A at 64–79). The circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an

amended motion "prior to the expiration of the two-year time limitation contained in rule 3.850" (*id.* at 102–04).  Petitioner filed an amended motion on October 4, 2011 (*id.* at 105–18).  The circuit court held an evidentiary hearing on September 20, 2012 (*id.* at 127–316).  The court denied the motion in an order rendered October 29, 2012 (*id.* at 317–27).  Petitioner appealed the decision to the First DCA, Case No. 1D12-6055 (Ex. B).  The First DCA affirmed the decision per curiam without written opinion on April 4, 2014, with the mandate issuing April 30, 2014 (Exs. D, E).  Sanchez v. State, 135 So. 3d 293 (Fla. 1st DCA 2014) (Table).

Petitioner filed the instant federal habeas action on May 20, 2014 (ECF No. 1).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n.15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review

'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Richter). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and

concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claim.

III.  PETITIONER'S CLAIM

Ground One: "Petitioner was denied effective assistance of counsel where counsel failed to file a motion to dismiss premised on the expiration of the statute of limitations in violation of Petitioner's Fifth, Sixth and Fourteenth Amendment rights under the U.S. Constitution."

Petitioner states he was arrested in Case No. 2005-CF-6346A on November 22, 2005, and charged with one count of lewd and lascivious battery on a person over 12 but under 16 years of age, and one count of lewd and lascivious molestation of a minor (ECF No. 1 at 5–8). He alleges that in 2001, he admitted to law enforcement that he had sexual activity with the victim (*id.*). He alleges he pleaded nolo contendere to all charges and was sentenced to 15 years on each count (*id.*). Petitioner alleges that his plea was involuntary in Case No. 05-6346, because his trial counsel was ineffective for failing to file a motion to dismiss the charges based upon expiration of the statute of limitations (*id.*). He contends that pursuant to Florida Statutes § 775.15(13)(a), the limitations period began to run when the victim reached the age of 18 or the violation was reported to a law enforcement agency, whichever occurred earlier (*id.*). Petitioner alleges he informed counsel that he reported the sexual activity to law enforcement in 2001 (*id.*). He alleges counsel advised him to

enter a "straight up" plea to the charges (*id.*). Plaintiff contends there was no reasonable justification to support counsel's failure to file a motion to dismiss, and that his informing her of his earlier report to law enforcement, alone, was a sufficient basis to file the motion (*id.*).

Petitioner asserts he presented this claim to the state courts in Claim One of his amended Rule 3.850 motion (ECF No. 1 at 5–8). He asserts the state court determined that a motion to dismiss based upon the expiration of the statute of limitations would have had merit; therefore, Petitioner demonstrated that he was prejudiced by counsel's failure to pursue the defense (*id.*). However, the state court concluded that counsel's decision not to pursue the defense was reasonable (*id.*). Petitioner contends this conclusion was an unreasonable application of clearly established federal law (*id.*). Petitioner seeks to have his sentence in Case No. 2005-CF-6346 vacated, his plea to those charges withdrawn, and the charges dismissed (*id.* at 19).

Respondent contends this claim is unexhausted and procedurally barred (ECF No. 22 at 6–9). Respondent argues that the claim presented to the state courts was that Petitioner's plea was involuntary because trial counsel failed to discuss the statute of limitations defense with him, and if counsel had done so, Petitioner would not have pleaded and instead would have insisted on going to trial (*id.*). Respondent contends that a claim that counsel failed to discuss a possible defense, thereby affecting the voluntariness of the defendant's decision to plea, is different than a claim that counsel failed to file a motion to dismiss the charge (*id.*). Respondent concedes that the state circuit court adjudicated the claim that Petitioner presents in his federal petition, but Respondent contends the court was without authority to adjudicate this claim, because it was not properly presented by Petitioner in his Rule 3.850 motion (*id.*). Therefore, the state circuit court's decision to consider the claim was erroneous, and Petitioner was barred from presenting it on appeal, because it was unpreserved (*id.*). Respondent alleges that it asserted this procedural bar in the post-conviction appeal of the circuit court's decision (*id.*). Respondent thus contends Ground One was not fairly presented to the state courts, and is unexhausted and procedurally barred from federal review (*id.*).

Respondent additionally contends that notwithstanding the exhaustion issue, Petitioner waived his constitutional challenge to his conviction by entering a no contest plea to the charges (ECF No. 22 at 9–11). Respondent argues that Petitioner claims only that counsel was ineffective for failing to file a motion to dismiss, but he does not claim that his plea was involuntary due to

counsel's alleged ineffectiveness (*id.*). Therefore, he waived his ineffective assistance of counsel ("IAC") claim when he entered his nolo contendere plea (*id.*).

The state court record demonstrates that in Claim One of Petitioner's amended Rule 3.850 motion, he claimed that counsel was ineffective for failing to investigate and advise him of the statute of limitations defense, and that there was a reasonable probability that counsel would have been successful in challenging the prosecution of the charges if counsel had done so (Ex. A at 109–14). Petitioner alleged that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial (*id.*). Petitioner alleged that he informed counsel that in October of 2001, he told Detective James of the Escambia County Sheriff's Office that he had sexual activity with the victim, and that he took a "lie detector test" during this interview with Detective James (*id.*). Petitioner alleged that he also informed counsel that in August of 2001, the victim's mother, Mrs. Bell, confronted him about "the relationship" between him and the victim, and Mrs. Bell then "informed the police about Sanchez [Petitioner]" (*id.*). Petitioner alleged that law enforcement began investigating the disappearance of the victim, Danielle Bell, on September 29, 2001 (*id.*). He alleged that the "lead detective" was told that Petitioner was in "a relationship" with the victim (*id.*). He alleged that the detective then contacted him and asked him to come to his office for an interview concerning the disappearance of Danielle (*id.*). Petitioner alleged that during that interview, he admitted that he had sexual contact with the victim, but stated that he did not know the age of the victim at the time of the sexual contact (*id.*). Petitioner alleged that at the conclusion of the interview, he was asked to take a polygraph test concerning his relationship with the victim, and he agreed to take the test (*id.*). He alleged that he was allowed to leave the office after he took the polygraph test (*id.*). Petitioner alleged that if he had been aware that a statute of limitations defense was viable, he would have insisted on going to trial (*id.*).

The state circuit court adjudicated the claim as follows:

### **"Claim One"**

First, Defendant claims that he would not have entered his plea if he would have known that a defense to the charges in case number 05-6346 existed. Specifically, Defendant asserts that counsel should have filed a motion to dismiss premised on the expiration of the statute of limitations. Defendant claims that he told counsel that Defendant had admitted to police in 2001 that he had had sexual activity

with the victim, and that the police had told him at that time that they were only interested in the disappearance of the victim, not the sexual activity. Defendant was ultimately arrested in this case on November 22, 2005. Defendant's trial counsel, Sharon Wilson, Esq., testified at the evidentiary hearing in this matter that she felt there was "no basis" for a motion to dismiss based on the expiration of the statute of limitations.

In order to determine if Defendant was prejudiced by the inaction of counsel, the Court must determine if a motion to dismiss would have been meritorious. Defendant was charged in this case with two second degree felonies, which under section 775.15(2)(b), "prosecution . . . must be commenced within 3 years after [the offense] is committed." However section 775.15(13)(a), Florida Statutes, mandates:

> If the victim of a violation of s. 794.011, former s. 794.05, Florida Statutes 1995, s. 800.04, s. 826.04, or s. 847.0135(5) is under the age of 18, the applicable period of limitation, if any, does not begin to run until the victim has reached the age of 18 ***or the violation is reported to a law enforcement agency or other governmental agency, whichever occurs earlier***. Such law enforcement agency or other govemmental agency shall promptly report such allegation to the state attorney for the judicial circuit in which the alleged violation occurred.

> (Emphasis added).

### Facts

First, it is important to recognize that the sexual activity in the instant case was discovered during an investigation of the disappearance of the victim. By all accounts, the victim, who was 14 years old at the time, was last seen September 29, 2001, and has never been found. At the evidentiary hearing on this motion, the State entered as "Exhibit 2" a report authored by Mark Smeester,[FN 2: Mark Smeester no longer works for the Escambia County Sherriff's [sic] Office.] who took over investigating the disappearance of the victim for the Escambia County Sherriff's [sic] Office (ECSO) in 2005. The following facts were compiled by the Court from Mr. Smeester's report, along with the testimony presented at the evidentiary hearing.

ECSO Officer Frank Fillingham investigated the victim's disappearance initially for one week in 2001. Officer Jimmy James subsequently took over investigating the disappearance. In 2002, Defendant submitted to polygraph tests on two occasions, which were both administered by Officer John Tindall [sic] with

inconclusive results.[FN 3: Reports summarizing these polygraph tests were admitted at the evidentiary hearing as State's Exhibit 1.] On June 29, 2004, Officers Thomas "Wayne" Orr and Chris Baggett took over investigating the case and again interviewed Defendant. In this interview, Defendant admitted that he had had a sexual relationship with the victim, but Defendant was not arrested at that time. In 2005, when Officer Mark Smeester took over the investigation, his report summarizing the interviews that he conducted notably included the following information that he had gathered:

1) Defendant admitted to having sex with the victim.

2) Robert Bassett, friend of Defendant, stated that he was aware of the sexual relationship between Defendant and the victim.

3) Joseph Bell, father of the victim, stated that he was aware of the sexual relationship between Defendant and the victim.

4) Susan Bell, mother of the victim, provided police with myriad information[FN 4: The report indicates that Susan Bell provided a notebook to Mark Smeester "in which she described in her own writing what she recalls regarding this case."] and stated that she was aware of the sexual relationship between Defendant and the victim. She also stated that she and the victim's uncle had confronted Defendant about the sexual relationship several months prior to the disappearance and that she was aware that the victim believed she was pregnant with Defendant's child.

5) Sherra Bentley, friend of the victim, stated that she was aware of the sexual relationship between Defendant and the victim, and had observed them having sexual activity.

6) Jennifer Davidson, friend of the victim, stated that she was aware of the sexual relationship between Defendant and the victim.

7) Gabriele Kohl, friend of the victim, stated that she was aware of the sexual relationship between Defendant and the victim and of the victim's possible pregnancy with Defendant's child. She stated that she had seen Defendant and the victim engage in fondling and passionate kissing "on at least 20 separate occasions."

8) Stacey Roberts, friend of the victim, stated that she was aware of the sexual relationship between Defendant and the victim and of the victim's possible pregnancy with Defendant's child.

9) Rachel Ryan, friend of the victim, who spoke to the victim on the phone shortly before her disappearance, stated that she was aware of the sexual relationship between Defendant and the victim and of the victim's possible pregnancy with Defendant's child.

10) Laqueta Savage, neighbor, stated that she was aware of the sexual relationship between Defendant and the victim.

11) John Scott, uncle of the victim, stated that he was aware of the sexual relationship between Defendant and the victim and had confronted Defendant, with the victim's mother, about the sexual relationship a few months before her disappearance. He also stated that he had spoken to an investigator prior to Mark Smeester about the incident involving the confrontation.

12) Jason Strother, friend of the victim, stated that he was aware of the sexual relationship between Defendant and the victim.

13) Jennie Tucker, friend of the victim, stated that she was aware of the sexual relationship between Defendant and the victim, and also stated that "everyone" was aware of sexual relationship between Defendant and the victim.

Based on this information, Defendant was arrested and charged in case number 05-6346 with one count of lewd or lascivious battery and one count of lewd or lascivious molestation.

In 2006, Defendant's trial counsel, Ms. Wilson, investigated Defendant's claim that he had told law enforcement in 2001 about the sexual activity in an effort to prove that the prosecution was beyond the statute of limitations. Ms. Wilson deposed Officer James and he stated that he could not remember if Defendant ever told him that he had a sexual relationship with the victim.[FN 5: The deposition of Jimmy James was State's Exhibit 3 at the evidentiary hearing.] Ms. Wilson also deposed Officer Orr and Officer Baggett, who said that they did not charge Defendant in 2004 after he admitted the sexual activity to them basically because they were busy and got distracted.[FN 6: State's Exhibits 4 and 6.] Ms. Wilson also deposed Mark Smeester,[FN 7: State's Exhibit 5], however she did [sic]. Defendant specifically claims that Officer Fillingham also administered a polygraph test in 2001 and that Defendant also admitted to the sexual activity at that time.

The Court convened an evidentiary hearing on this motion on September 20, 2012 at which Defendant was present. Officer James testified at the evidentiary hearing that he interviewed "a lot" of people, including Defendant, during his investigation of the victim's disappearance. He further testified that Defendant did

not tell him about the sexual activity, because if he had, Officer James would have "probably charged him." Defendant questioned Officer James as follows:

> Q: You told me, "'I'm not really worried. I'm worried about the disappearance."
>
> A: And that's probably what I did tell you because my job is to investigate and make you comfortable to tell you something like that for you to get the truth, and my job is to find out the truth what happened to Danielle Bell. <u>See</u> pp. 44-45, evidentiary hearing transcript.

Defendant further questioned Officer James on p. 46:

> Q: When you took me home, I told you that I had a relationship with her. And you were like, "Well, I'm worried about the missing person. We have to find her."
>
> A: "I remember telling you in an interview, in a recorded interview, that I was mainly focused on the missing person and the disappearance of Danielle Bell and that was to make you comfortable to talk to me to find out where her body was at."

Ms. Wilson testified at the evidentiary hearing that she considered the statute of limitations argument, conducted depositions in an effort to investigate the issue, and then determined that there was "no basis for a motion," because she was unable to confirm through depositions that law enforcement had been aware of the sexual activity any earlier than 2004.

## <u>Analysis</u>

It appears that in 2005, witnesses who were aware of the sexual activity were abundantly available. After reviewing Mark Smeester's investigative report and the information that witnesses gave him in his effort to investigate the victim's disappearance, it appears that many people considered Defendant and the victim to be "dating," and observed them together "all of the time." Many people were aware of a rumor that she was pregnant with his child. All of this information would have been highly relevant to the investigation of her disappearance from the first day in 2001. Additionally it seems highly unlikely that out of all of these independent witnesses, many who were presumably previously interviewed by Officer James or perhaps Officer Fillingham, no one ever mentioned that she was having a sexual relationship with Defendant and/or that she may have been pregnant with his child. As it appears that a motion to dismiss based on the expiration of the statute of

limitations would have had merit, prejudice is established. However, to prove a claim for ineffective assistance of counsel in violation of the Sixth Amendment, a defendant must demonstrate both prejudice **and deficient performance**. <u>See</u> <u>Strickland v, Washington</u>, 466 U. S. 668, 104 S. Ct 2052 (1984).

"An attorney's performance must be reasonable under the prevailing professional norms, considering all of the circumstances, and viewed from the attorney's perspective at the time of trial." <u>Id.</u> at 2066. "There is a strong presumption of reasonableness that must be overcome, and strategic or tactical decisions by counsel made after a thorough investigation are 'virtually unchallengeable.'" <u>Downs v. State</u>, 453 So. 2d 1102, 1108 (Fla. 1984). "Nevertheless, 'patently unreasonable' decisions, although characterized as tactical, are not immune." <u>Roesch v, State</u>, 627 So. 2d 57, 58 n.3 (Fla. 2d DCA 1993) (counsel was deficient for making a "strategic" decision to pursue a speedy trial rather than investigate witnesses.)

In <u>Cabera v. State</u>, defense counsel testified at an evidentiary hearing on a postconviction motion that she investigated a defense of entrapment and decided not to present it at trial. 766 So. 2d 1131 (Fla. 2d DCA 2000). The trial court found that this was a "reasonable trial tactic." However, the appellate court reversed, finding trial counsel's decision unreasonable especially because the defendant had no other available defense. Moreover, the appellate court recognized that the defense was not guaranteed to succeed, but found that in the absence of another viable defense the failure to pursue the entrapment defense constituted ineffective assistance of counsel because "defense counsel, by [her] substandard performance, deprived defendant of his sole defense and the opportunity to corroborate the defense." <u>Id.</u> at 1134.

Similarly, in <u>Hayes v. State</u>, the Court found deficient performance where counsel made a decision to abandon an insanity defense, which was the only viable defense: "[T]he record does not demonstrate that counsel's decision to abandon the insanity defense at the direction of his client was reasonable under the circumstances of this case." 56 So. 3d 72, 74 (Fla. 2d DCA 2011). Additionally, although not controlling, the Court finds the following authority persuasive:

> We begin our analysis with the question whether petitioner's trial counsel exercised reasonable professional skill and judgment. As we have noted, petitioner argues that his criminal trial counsel failed to do so by failing to raise a statute of limitations defense to the charge of attempted rape in the first degree. According to petitioner, under ORS 131.125(6), unless otherwise "expressly provided by law," prosecutions for a felony must commence within three years of the commission of the act. In this case, he argues, attempted rape is a felony, and no other statute of limitations is "expressly provided by

law."  It necessarily follows, he deduces, that the three-year statute of limitations applies, and criminal trial counsel failed to exercise reasonable professional skill and judgment in failing to assert the statute as a defense . . .  In this case, given the obvious possible benefits of asserting the applicability of the three-year statute of limitations provided in ORS 131.125(6)—dismissal of the charge, with no negative strategic impact on the defense of the other charges—we agree with petitioner that an attorney exercising reasonable professional skill and judgment would have moved to dismiss the attempted rape charge based on that statute.

Lamb v. Coursey, 238 Or. App. 647, 650–651, 243 P. 3d 130, 133 (Or. App. 2010) (Emphasis added).

Lamb is highly persuasive, and if it were the law in Florida it would likely require granting relief on Claim One.

Conversely, when judging a claim of ineffective assistance, a Court must endeavor to eliminate the "distorting effects of hindsight by evaluating the performance from counsel's perspective at the time." Blanco v. Wainwright, 507 So. 2d 1377, 1381 (Fla. 1987).  The Court finds Ms. Wilson to be credible.  It appears that it would have been preferable to make a motion to dismiss based on the expiration of the statute of limitations, even based solely on the testimony of her client, thus preserving the issue for appellate review.  However, Ms. Wilson stated at the evidentiary hearing unequivocally that in her opinion there was "no basis" for the motion.  The Court is required to have "a strong presumption that counsel's actions were reasonable at the time of the conduct."  See Johnston v. State, 70 So. 3d 472, 477—478 (Fla. 2011) (construing Strickland v. Washington, 466 U. S. 668 (1984)).  After much consideration, the Court finds that Ms. Wilson investigated the issue, and made a reasonable decision not to file a motion to dismiss, which was within "the wide range of professionally competent assistance."  Id.  Accordingly, the Court finds that Ms. Wilson was not deficient.  Therefore, Defendant's claim must be denied.

(Ex. A at 318–25).

Petitioner appealed the circuit court's decision to the First DCA (Ex. B).  In his initial brief, he argued as Issue II, "The trial court erred when it found reasonable Sanchez's former counsel's decision not to file a motion to dismiss because the statute of limitations had expired" (id. at 16–24).

In its answer brief, the State argued that Petitioner failed to preserve the claim by failing to argue it in his Rule 3.850 motion (Ex. C at 24–26).  The State argued, as it does here, that

Petitioner's sole claim in his Rule 3.850 motion with respect to the statute of limitations defense was that his plea was involuntarily entered because trial counsel failed to discuss the defense with him, and that had counsel done so, he would not have pleaded and instead would have insisted upon a trial (*id.*). The State argued that a claim that counsel failed to discuss a possible defense with the defendant was different than a claim of ineffectiveness for failing to move to dismiss a charge, because the former claim affected whether the defendant's decision to enter a plea was knowing and voluntary, but the latter ineffectiveness did not (*id.*). The State argued that the circuit court was not authorized to rule on the claim that counsel was ineffective for failing to file a motion to dismiss, and thus had no jurisdiction to rule on it, because Petitioner did not raise it in his Rule 3.850 motion (*id.*).

In its answer brief, the State also addressed the merits of Petitioner's claim (Ex. C at 25–42). The State first argued that trial counsel discussed the possibility of a statute of limitations defense with Petitioner prior to entry of his plea, and thus was not ineffective for failing to discuss the defense with him (*id.* at 27–36). Second, the State argued that the trial court's finding of prejudice with respect to trial counsel's failure to file a motion to dismiss was not supported by competent substantial evidence and thus could not be sustained (*id.* at 36–38). Third, the State argued that the trial court properly found that trial counsel was not constitutionally deficient in failing to file a motion to dismiss (*id.* at 38–42).

The First DCA affirmed the circuit court's decision without written opinion (Ex. D).

At the outset, the court rejects Respondent's exhaustion defense. First, the issue adjudicated on the merits by the state circuit court and presented to the First DCA in the post-conviction appeal is the same issue presented by Petitioner in his federal habeas petition, that is, his plea was the product of ineffective assistance of counsel, because counsel advised him to plead nolo contendere without advising him of or pursuing a viable defense, namely, a statute of limitations defense.

Second, the First DCA adjudicated the claim on the merits. Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *See* Richter, 562 U.S. at 99. When, as here, a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must

presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary. *Id.* The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 99–100.

Here, Respondent suggests that the First DCA may have affirmed the lower court's decision because Petitioner did not raise in the lower court the issue he raised on appeal, despite the lower court's ruling on that very issue. However, Respondent's assertion of a mere possibility that the First DCA rejected Petitioner's argument on a state procedural ground, without any indication from the First DCA that it did so, is insufficient to rebut the presumption that the First DCA adjudicated the merits of the claim presented as Issue Two in Petitioner's initial brief, which was the same claim adjudicated on the merits by the lower court, and the same claim presented in Petitioner's federal petition. Therefore, the First DCA's decision is subject to review under § 2254(d).[3] *See* Richter, 562 U.S. at 100.

The court will next address Respondent's waiver argument. Respondent argues that Petitioner claims only that counsel was ineffective for failing to file a motion to dismiss, and he does not claim that his plea was involuntary due to counsel's alleged ineffectiveness. Therefore, Petitioner waived his IAC claim when he entered his nolo contendere plea.

The Supreme Court has expressly held that a defendant does not waive an ineffective assistance of counsel claim simply by entering a plea. Instead, because "voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases," courts must continue to apply the familiar two-part test provided by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See* Lafler v. Cooper, — U.S. —, 132 S. Ct. 1376, 1384, 182 L. Ed. 2d 398 (2012) (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); Missouri v. Frye, — U.S. —, 132 S. Ct. 1399, 1404, 1409–10, 182 L. Ed. 2d 379 (2012) (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for failing

---

[3] Because the First DCA's decision in the Rule 3.850 proceeding was the last state court adjudication of the merits of the federal claim, it is that adjudication that is reviewed under § 2254(d). *See* Hittson v. GDCP Warden, 759 F.3d 1210, 1231 (11th Cir. 2014) (citing Newland v. Hall, 527 F.3d 1162, 1198–99 (11th Cir. 2008)).

to communicate a prosecution plea offer before it lapsed); <u>Hill v. Lockhart</u>, 474 U.S. 52, 56–57, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying <u>Strickland</u>'s two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).

Indeed, the Eleventh Circuit recently addressed the waiver argument in <u>Arvelo v. Sec'y, Fla. Dep't of Corrs.</u>, 788 F.3d 1345 (11th Cir. 2015). In <u>Arvelo</u>, the federal habeas petitioner claimed that trial counsel was ineffective for failing to pursue a motion to suppress his confession prior to his entry of a no contest plea. 788 F.3d at 1347–48. The state court determined that the petitioner waived his IAC claim by entering a guilty plea. *Id.* The state court did not conduct an evidentiary hearing on the IAC claim. *See id.* at 1349. The federal district court acknowledged the state court's finding of waiver, and then offered three alternative reasons for rejecting the petitioner's claim: (1) the petitioner could have been convicted on the basis of eyewitness testimony and DNA evidence; (2) the petitioner had not shown prejudice, because he received a sentence lower than that which he could have expected if he had gone to trial; and (3) the petitioner had not proven that his confession was involuntary or coerced. *Id.* at 1348.

The Eleventh Circuit first rejected the state court's waiver determination as a misapplication of binding Supreme Court precedent. <u>Arvelo</u>, 788 F.3d at 1348 (citing <u>Strickland</u> and <u>Hill</u>). The Eleventh Circuit additionally concluded that because the IAC claim was not waived, the state court's failure to consider trial counsel's decision not to file a motion to suppress was also contrary to clearly established federal law. *Id.* at 1340. The court explained:

> In cases like this one, where a petitioner faults his lawyer for failing to pursue a motion to suppress prior to entering a plea, both the deficient performance and prejudice prongs of <u>Strickland</u> turn on the viability of the motion to suppress. This is because a lawyer's performance only falls outside the range of competence demanded of counsel if she did not pursue a motion to suppress that would have affected the outcome of the case had the defendant rejected the plea and proceeded to trial. <u>Premo v. Moore</u>, 562 U.S. 115, 124, 131 S. Ct. 733 (2011) (addressing <u>Strickland</u>'s performance prong and stating that the relevant question was whether "no competent attorney would think a motion to suppress would have failed"); <u>Lynch v. Sec'y, Fla. Dep't of Corr.</u>, 776 F.3d 1209, 1219 n.6 (11th Cir. 2015) ("<u>Hill</u> makes clear that the prejudice inquiry in a case like this turns largely on an assessment of whether the defense likely would have changed the outcome at trial.").

> We recognize that in deciding whether to enter a plea, defense lawyers carefully balance both "opportunities and risks" without fully knowing the strength of the State's case.  Moore, 562 U.S. at 124, 131 S. Ct. at 741.  Therefore, we must, as we do for all Strickland claims, afford "substantial deference" to a lawyer's strategic choices.  Id. at 126, 131 S. Ct. at 742.  But because ineffective assistance of counsel claims are not waived by entering a plea, the state court's failure to consider those strategic choices at all was contrary to clearly established federal law.

Id. at 1348–49.  The Eleventh Circuit also rejected the district court's alternative reasons for denying habeas relief.  Id. at 1349.  The court held that if the petitioner's allegations in his habeas petition were true, he would be entitled to habeas relief; however, because neither the state court nor the federal court afforded the petitioner the opportunity to develop the factual basis for his claim in an evidentiary hearing, the Eleventh Circuit remanded to the district court for an evidentiary hearing. Id. at 1350.

Here, Petitioner claims in his federal petition, as he did in his amended Rule 3.850 motion, that trial counsel was ineffective for failing to advise him of and pursue, prior to entry of his no contest plea, a motion to dismiss based upon expiration of the statute of limitations.  Based upon Supreme Court and Eleventh Circuit precedent, Petitioner did not waive this IAC claim simply by entering a plea.  Therefore, the court will review Petitioner's IAC claim under § 2254(d).

The first prong of the Strickland standard requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness."  Hill, 474 U.S. at 57.  The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances."  Strickland, 466 U.S. at 691.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689. The Supreme Court has expressly warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments.  All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court.  Even then the truth will often be in dispute.  In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case.  Counsel

> must predict how the facts, as he understands them, would be viewed by a court . . . . Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann, 397 U.S. at 769–70.

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57. Under this standard, representation is ineffective only if counsel commits "serious derelictions" of her duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990). The Eleventh Circuit has commented that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between [entering a plea] and going to trial." Id. This requires counsel to "offer his informed opinion as to the best course to be followed" and impart "a general knowledge of the possible legal consequences of facing trial" to the defendant. Id. Therefore, a defendant's failure to "correctly assess every relevant factor entering into his decision" does not undermine a validly entered guilty plea. Id. at 1509.

Strickland's second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 131 S. Ct. at 788. As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Id.</u> (citations omitted).

Here, unlike in <u>Arvelo</u>, the state court held an evidentiary hearing, thus providing Petitioner an opportunity to develop the factual basis for his claim. At the evidentiary hearing, Petitioner's former trial counsel, Attorney Wilson, testified that she was "very aware" of the statute of limitations issue (Ex. A at 130–33). She testified that she and Petitioner discussed that issue, because Petitioner had several cases pending, and one of those cases was dismissed on statute of limitations grounds (*id.*). Attorney Wilson testified that she did "a lot of research" on the statute of limitations issue and asked questions during depositions that would establish the time frame of when the statute of limitations began to run (*id.*). Petitioner conducted the following examination of Attorney Wilson:

> Q. All right. Why didn't I get a copy or a record whenever I commit—when I said I committed a crime to Jimmy James, the deputy there, when I openly verbally—how you say it, I verbally told on the interview and he was aware of that?
>
> A. And what is your question to me?

Q.      Why didn't I get the paperwork on that or when we were discussing it?

A.      The only paperwork I had that addressed that issue was the deposition, and I asked Deputy James that in the deposition, so it would have been contained in the deposition transcript. And truthfully, I don't recall if you ever asked me for copies of the deposition but I know that I always review what happens in the deposition. I review the statements that everybody makes with my clients, so I know you and I did that. I don't recall whether I ever gave you a copy of the deposition transcript.

Q.      I ain't [sic] got a copy yet. Another thing, I just feel that you misled me for the open plea instead of going to trial.

A.      What's your question?

Q.      Did you feel that I was going to get railroaded whenever I was going in front of Judge Bell since you suggested me to do an open plea, or did you just feel that I should have just went to trial?

A.      I did not feel like you had a good case for trial because we did try to suppress your statements; that was not successful. So we could not keep your statement out where you basically admitted to committing the crimes, so I did not feel like it was a good case for trial. We had no choice, as far as entering the plea, because we were not made an offer. We didn't have an offer that we could accept or reject so if you were going to enter a plea, the only option was a straight-up plea. And I was - - I was surprised at your sentence, but there was nothing I could do about it. I mean, I had hoped that you would get a lot less than you did, but I never made any promises to you about what you would get because with a straight-up plea, I can't do that.

(Ex. A at 133–34).

On cross-examination, Attorney Wilson testified as follows:

Q [by the State]. Now, Claim 1, he alleges that you were ineffective for not informing him about the expiration of the statute of limitations. And I seem to recall reading somewhere that he had—actually, it's on page 6—that he had told Jimmy James, who was the initial detective that was in charge of the missing person's investigation that he was in a sexual relationship with the victim. Did he share that information with you?

A.      Yes, he did tell me that he had told Jimmy James that, and specifically he told me that he had given that information during a polygraph test that was

administered by Jimmy James. So when I took the deposition of Jimmy James, we established that he doesn't give polygraph tests, so it would have been, I believe, Deputy or Mr. Tindell. And so I had two people that I needed to ask about that, so in the deposition I asked Deputy James about that and he didn't have any memory of ever being told information about a sexual relationship with the victim in this case. What he told me was he was focused on the disappearance of the victim, not any relationship she might have been having.

Q.      Now, I believe that you also took Mr. Tindell's deposition who was the deputy that administered two polygraphs, I believe, at the request of Deputy James; is that correct?

A.      Yes.

Q.      And what information did you learn there?

A.      That Mr. Tindell did give two polygraphs. The questions were slightly different in the two different ones, and I specifically asked him if he had asked any questions about any sexual relationship between Mr. Sanchez and the victim, and he said no. That he was basically told by Deputy James to focus on the disappearance of Ms. Bell, so that was the focus of his questions, not about any sexual relationship.

Q [ ].  I'm providing a copy of this to Mr. Sanchez. And let me show you what has been marked for identification as State's No.1. I think it's, perhaps, covered by a note that you would not have been given, but if you will look on the succeeding pages, would you tell me if you recognize that?

A.      Actually, no, I never ever saw this.

Q.      Now, I think that what—have you reviewed the depositions themselves?

A.      Yes.

. . . .

Q.      Well, since you have reviewed Deputy Tindell's deposition, does this square with your recollection of his testimony?

A.      It does, yes.

Q.      I think you also deposed Wayne Orr?

A.      Yes.

Q.    Wayne Orr basically told you that, I think, Mr. Sanchez had confessed to him back on June the 29th, 2004; is that correct?

A.    Yes.

Q.    And based on your discovery of the case, Deputy Orr was the deputy that succeeded Deputy James in the investigation of the missing person's matter; is that correct?

A.    Yes.

Q.    Based on your depositions, your discovery, when do you believe that this allegation of sexual conduct or contact between Mr. Sanchez and Danielle Bell, when do you believe that was reported to the sheriff's office?

A.    I don't believe anybody else actually reported it.  I think it came to light with an interview that Deputy Orr had with Mr. Sanchez in 2004.

(Ex. A at 135–40).

The court asked Attorney Wilson what information she had as to the original report to law enforcement of any alleged sexual activity between Petitioner and Danielle Bell (Ex. A at 141). Attorney Wilson testified that Petitioner told her that in 2001, he informed Deputy Jimmy James about sexual activity (*id.*).  Wilson testified that she tried to confirm that fact, but she could not establish any date prior to 2004 that any law enforcement officer was made aware of the sexual activity (*id.*).  Wilson testified that she did not file a motion to dismiss, because she could not establish that the matter of the sexual relationship between Petitioner and the victim had come to the attention of law enforcement prior to 2004, and thus had no basis to file a motion to dismiss (*id.* at 177).  She testified that she was aware of the polygraph examinations, but Petitioner did not disclose any information about a sexual relationship in either examination (*id.* at 178).

Petitioner testified that in approximately November of 2001 or the "early beginning" of 2002, he told Investigator Jimmy James and Investigator Fillingham "everything," and that he knew that what he did was wrong, but he had nothing to do with Danielle Bell's disappearance (*see* Ex. A at 140, 179–80).  He testified that the officers told him that they were not concerned about "what Petitioner did or how he did it," they were just worried about Danielle Bell's disappearance (*id.* at 180).  Petitioner testified that he told the officers how he met the victim and that he ended his

relationship with her three months prior to her disappearance (*id.*). He testified that he provided this information in a polygraph examination conducted by someone other than Sergeant Tindell, possibly Fillingham (*id.* at 140). He testified that he told Investigator Orr and Investigator Smeester the same thing that he told Jimmy James (*id.*).

Investigator Jimmy James testified at the evidentiary hearing. Petitioner questioned him as follows:

> Q.     All right. The second time that I took one—when was the first time that I took the polygraph test?
>
> A.     I can't recall. It was in 200l between 2003.
>
> Q.     The second polygraph that I took, when you picked me up at my mother's home, on Well Line Road—
>
> A.     Okay.
>
> Q.     —you took me to the station—
>
> A.     Okay.
>
> Q.     —and I took a polygraph test.
>
> A.     Okay.
>
> Q.     On the way back, didn't I—did I or did I not told [sic] you that I had a sexual relationship with—
>
> A.     You never told me that.
>
> Q.     I told you while we were in the car.
>
> A.     You never—never mentioned that. If you had, I would have investigated that.
>
> Q.     You told me, "I'm not really worried. I'm worried about the disappearance."
>
> A.     And that's probably what I did tell you because my job is to investigate and make you comfortable to tell you something like that for you to get the truth, and my job is to find out the truth what happened to Danielle Bell.

. . . .

       Q.     All right.  Whenever—whenever we was driving when you were taking me back home to my mother's house, I told you that I had a relationship with her and you just blew it off.

       A.     You didn't tell me that.  If you told me that, I would have investigated that.  I would have probably ended up charging you with that.

(Ex. A at 170–71).  Investigator James testified that he began his investigation when he received the missing person's report regarding Danielle Bell (*id.* at 171).  He testified that Investigator Frank Fillingham was assigned to the case approximately one week prior to that (*id.*).  Investigator James testified that Susan Bell, the victim's mother, provided several names to him, including Petitioner's, but she never mentioned that Petitioner was having a sexual relationship with Danielle (*id.* at 171–72).  Investigator James testified that if Susan Bell had told him that, he would have investigated it (*id.* at 172).  Petitioner again questioned Investigator James as to whether he recalled Petitioner telling him about the sexual relationship during the ride home from the second polygraph test (*id.*).  James testified that he recalled telling Petitioner in a recorded interview that he (James) was focused on the disappearance of Danielle Bell (*id.*).  He stated that the reason he told Petitioner this was to make Petitioner feel comfortable talking to him about the victim, so that James could find out the location of the victim's body (*id.*).  Petitioner insisted that during that interview, he told Investigator James about the sexual contact, but James insisted that Petitioner did not (*id.* at 173).  Investigator James testified that the recording of the interview would verify this (*id.*).  He testified that his involvement in the investigation ended in 2003, and that there was no indication of any sexual interaction between Petitioner and Danielle Bell during his involvement in the investigation (*id.* at 173–74).  Investigator James admitted that during his deposition on March 28, 2006, Attorney Wilson asked him whether Petitioner ever referred to having sexual activity with Danielle, and he answered, "I don't remember him telling me that but, I mean, he may have." (*id.* at 174–75).  But James testified that he subsequently reviewed his notes and the recorded interview with Petitioner, and Petitioner never disclosed any sexual relationship (*id.* at 175).

     Investigator Mark Smeester testified at the evidentiary hearing.  Smeester testified that Petitioner admitted to both him and Investigator Wayne Orr that he had a sexual relationship with Danielle Bell (Ex. A at 146).  Smeester testified that Petitioner's admissions were subsequently

corroborated by statements from other people regarding their observations and information that Danielle Bell had told them (*id.* at 146, 161). Investigator Smeester testified that the investigation involving Danielle Bell began in 2001 as a missing persons investigation, and it became a "sex case" investigation in June of 2004, when Petitioner reported to Investigator Orr that he had sexual contact with Danielle Bell (*id.* at 149). Smeester testified that he reviewed the entire case file, including handwritten notes, memoranda, and all investigative activities that occurred in relation to the missing persons report received by law enforcement in September of 2001, and the first indication of Petitioner's sexual involvement with Danielle Bell was in June of 2004 (*id.* at 149–50, 161). A copy of Investigator Smeester's report was admitted into evidence as State's Exhibit 2 (*id.* at 150–51, 191–238). Included in Smeester's report was a summary of his interview with Jason Lamont Strother on November 2, 2005 (*id.* at 230–32). Jason Strother told Investigator Smeester that Danielle Bell told him in August or September of 2001 that she had been "gang raped" by Petitioner and some of his friends (*id.*). Strother told Investigator Smeester that he previously provided this information to an investigator, who was accompanied by Susan Bell, Danielle's mother (*id.* at 232).[4] Investigator Smeester's report included a summary of the information discovered by Investigator Orr during his investigation (*id.* at 191–93). The report indicates that during an interview between Petitioner and Investigators Orr and Baggett at the county jail on June 29, 2004, Petitioner admitted to engaging in sexual activity with Danielle Bell (*id.* at 191). Investigator Orr interviewed several other people during his investigation, and during an interview with Stacey Roberts on December 8, 2004, Susan Bell was present (*id.* at 193). There is no mention of an interview between Orr and Jason Strother. Investigator Smeester's report also indicates that Smeester interviewed Susan Bell on August 5, 2005 (*id.* at 196). Susan Bell provided Smeester with a notebook in which she described what she recalled regarding the case (*id.*). Investigator Smeester summarized the information contained in Susan Bell's notebook, which described events from the Spring of 2001 to September 21, 2001, one week prior to Danielle's disappearance (*id.* at 196–98).

---

[4] It appears that the state circuit court confused John Scott with Jason Strother. Investigator Smeester's report states, albeit it in a confusing manner, that Jason Strother, not John Scott, told Smeester that he talked with an investigator on one other occasion, and that the investigator was accompanied by Susan Bell (*see* Ex. A at 232).

Smeester's report did not indicate that the notebook contained any information regarding when law enforcement became aware of the sexual relationship between Danielle and Petitioner (*id.*).

Another document admitted into evidence, as State's Exhibit 1, was a letter written by Investigator Smeester to Assistant State Attorney Lee Robinson, which stated that Sergeant Tindell administered polygraph examinations to Petitioner on April 30, 2002 and June 27, 2002 (Ex. A at 151–52, 185). Investigator Smeester testified that sexual activity between Petitioner and Danielle Bell was never discussed during either of the polygraph examinations (*id.* at 160–61). He testified that the reports of the polygraph examinations were included in State's Exhibit 1 (*id.* at 160–61, 186–90). Those reports indicated that the polygraph examination occurred on April 30, 2002, and June 27, 2002, and that both examinations were requested by Investigator Jimmy James (*id.* at 186–90). The polygraph reports indicated that Petitioner was not questioned about sexual activity with Danielle Bell (*id.*).

The 2006 depositions of Investigators Jimmy James, Thomas Orr, Mark Smeester, Chris Baggett, and John Tindell were admitted as evidence at the evidentiary hearing (*see* Ex. A at 176). The following is a summary of the deposition testimony.

Investigator Jimmy James stated during his deposition that he became involved in the investigation of Danielle Bell's disappearance in early October of 2001 (Ex. A at 242–43). He testified that he interviewed Petitioner, Alex Sanchez, Rowel Enumerables, Robert Bassett, Stacey Roberts, and David King as part of his investigation (*id.* at 243–44). When asked whether Petitioner ever referred to having sexual activity with Danielle, Investigator James replied that the did not recall Petitioner telling him that, but Petitioner may have (*id.* at 244). Investigator James testified that all of his interviews of Petitioner were either audio recorded or reduced to a written witness statement (*id.* at 245–46). Investigator James could not recall whether he administered a polygraph examination of Petitioner in October of 2001 (*id.* at 246). James testified that he did not recall making any statements to Petitioner regarding Petitioner's having sex with Danielle Bell (*id.* at 247). Investigator James testified that in 2003, he gave all of his investigative materials to Investigator Wayne Orr or Chris Baggett (*id.* at 248).

Sergeant John Tindell testified during his deposition that he had been administering polygraph examinations for the Escambia County Sheriff's Office since the fall of 2001, and that

he was the only authorized polygraph operator in the Sheriff's Office (Ex. A at 307, 313–14). Tindell testified that he administered two polygraph examinations of Petitioner in 2002 (*id.*). Tindell testified that he did not ask Petitioner any questions about a sexual relationship with Danielle Bell in either polygraph examination (*id.* at 312).

Investigator Thomas Orr testified in his deposition that in June of 2004, he began investigating the missing person/possible homicide of Danielle Bell (Ex. A at 257–58). He testified that he was told by Investigator Jimmy James that Petitioner was a "person of interest" in the case (*id.* at 255–57). Investigator Orr testified that he made contact with Petitioner on approximately two occasions in June of 2004, and they discussed Petitioner's having a sexual relationship with Danielle (*id.* at 260–61). Orr testified that when Investigator Jimmy James gave him Petitioner's name as a person of interest, James did not give him any information regarding a "sexual relationship" between Petitioner and Danielle (*id.* at 261). Orr testified that he did not administer a polygraph examination or a Computer Voice Stress Analyzer ("CVSA") to Petitioner, nor was he present during any such examination (*id.* at 264–65).

Investigator Chris Baggett testified in his deposition that he made contact with Petitioner on June 29, 2004 (Ex. A at 293–98). He testified that he and Investigator Orr interviewed Petitioner while Petitioner was in custody on an unrelated matter (*id.*). Baggett testified that Petitioner told them that he had a sexual relationship with Danielle Bell and other girls (*id.* at 295). Baggett testified that this was the only time he spoke with Petitioner (*id.* at 296). He testified that a polygraph test was administered by John Tindell (*id.*). Baggett testified that he also spoke with Danielle Bell's mother, who was always giving them additional names of persons to talk to regarding Danielle's disappearance (*id.* at 297). Baggett testified that he also spoke with Petitioner's brother, but he did not provide any information (*id.*).

Investigator Mark Smeester testified in his deposition that he became involved in the missing person investigation of Danielle Bell in June of 2005 (Ex. A at 271, 273). He testified that he took over the investigation from Investigator Orr (*id.* at 272). Smeester testified that he first made contact with Petitioner in September of 2005, when Petitioner was arrested for illegal sexual activity with Summer Scott (*id.* at 273, 275, 278, 283). He testified he interviewed Petitioner on September 23, 2005, regarding Petitioner's knowledge of the whereabouts of Danielle Bell (*id.* at 274–76).

Investigator Smeester testified that he had seen a report from Investigators Orr and Baggett that Petitioner admitted to them on June 29, 2004, that he had sex with Danielle Bell (*id.* at 276–77, 282). Smeester testified that he was "taken aback" when Petitioner stated during his interview in September of 2005, that he had been engaged in sexual activity with Danielle Bell (*id.*). Investigator Smeester testified that all of the information he had about Petitioner's sexual activity with Danielle Bell was contained in his report (*id.* at 285). He testified that Sergeant John Tindell administered two polygraph tests to Petitioner (*id.* at 279–80).

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Questions of the credibility and demeanor of a witness are questions of fact. *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)). The AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e).

Further, where, as here, the state court has decided an issue on the merits, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, —U.S. —, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). Likewise, based on the plain language in the statute itself, review under § 2254(d)(2) is limited to

"evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); <u>Pinholster</u>, 131 S.Ct. at 1400 n.7.

Here, Petitioner has not presented clear and convincing evidence to rebut the state court's factual determination that Attorney Wilson's testimony at the evidentiary hearing was credible (*see* Ex. A at 325).  Deferring to the state court's credibility determination, defense counsel's testimony establishes (1) she was "very aware" of the statute of limitations issue, (2) she and Petitioner discussed the statute of limitations issue, (3) she did "a lot of research" on the statute of limitations issue, (4) she conducted depositions of law enforcement officers involved in the investigation of Danielle Bell's disappearance, and asked questions during depositions that would establish the time frame when the statute of limitations began to run on the sexual activity involving Petitioner, and (5) she made a strategic decision not to file the motion to dismiss, because she could not establish that the matter of the sexual relationship between Petitioner and the victim had come to the attention of law enforcement prior to 2004.

Further, the only evidence in the state court record that prior to 2004, law enforcement was aware of Petitioner's sexual activity with Danielle Bell, was Petitioner's allegation in his amended Rule 3.850 motion, signed under penalty of perjury, that he told Attorney Wilson that in October of 2001, during an interview with Investigator James which included a polygraph examination, that he had sexual activity with Danielle Bell (*see* Ex. A at 110–11, 114).  However, when Petitioner had the opportunity to present evidence at the evidentiary hearing to support his allegation, he did not present any evidence, other than his own self-serving testimony, that law enforcement knew of the sexual activity prior to December 14, 2002 (three years prior to the date the prosecution commenced).  Petitioner testified that "around November [of 2001] or early beginning of 2002," he told Investigators James and Fillingham about his sexual activity.  Petitioner also testified that he disclosed his sexual activity during a polygraph examination conducted by someone other than Sergeant Tindell, possibly Investigator Fillingham, and that he also disclosed his sexual activity to Investigator James during the ride home from the second polygraph test.

However, there was no evidence that anyone other than Tindell administered, or was authorized to administer, a polygraph examination.  Further, Sergeant Tindell testified, and the reports of the polygraph examinations conducted on April 30, 2002, and June 27, 2002 confirmed,

that Petitioner was not asked about sexual activity during either of the examinations. Additionally, although Investigator James's pre-trial deposition testimony was equivocal as to whether Petitioner told him about sexual activity with Danielle Bell, he subsequently reviewed his notes and reports (as he would have done prior to a hearing on a motion to dismiss) and testified unequivocally that Petitioner never disclosed sexual activity to him (during the ride home from the second polygraph examination or at any other time). Thus, if Attorney Wilson had filed a pre-trial motion to dismiss the charges, she would have had no evidence to present in support of her motion, except Petitioner's self-serving, equivocal, and uncorroborated testimony, which was disputed by all of the officers involved in the investigation.

The state court reasonably applied <u>Strickland</u> in determining that defense counsel did not perform deficiently during the plea process by failing to pursue dismissal of the charges based upon expiration of the statute of limitations. Although the state court determined that "it appears that a motion to dismiss based on the expiration of the statute of limitations would have had merit," and "[i]t appears that it would have been preferable to make a motion to dismiss based on the expiration of the statute of limitations," the court concluded that defense counsel "made a reasonable decision not to file a motion to dismiss, which was within 'the wide range of professionally competent assistance.'" (Ex. A at 325).[5] In other words, Petitioner failed to show that <u>no</u> <u>competent</u> <u>attorney</u> in the circumstances presented to Attorney Wilson, would have concluded that a motion to dismiss would have failed. *See* <u>Premo</u>, 562 U.S. at 124 (addressing <u>Strickland</u>'s performance prong and stating that the relevant question was whether "no competent attorney would think a motion to suppress would have failed").

Based upon the foregoing, there is a reasonable argument that defense counsel satisfied <u>Strickland</u>'s deferential standard with regard to the performance prong, by reasonably deciding that

---

[5] The state court's determination that "it appears that a motion to dismiss based on the expiration of the statute of limitations would have had merit," was not based upon any direct evidence that law enforcement knew about Petitioner's sexual activity prior to December 14, 2002. Rather, the court opined that because all of the information obtained by Investigator Smeester in 2005 was available and "highly relevant" to the missing persons investigation which commenced in late September or early October of 2001, "<u>it</u> <u>seems</u> <u>highly</u> <u>unlikely</u> that out of all of these independent witnesses, many who were <u>presumably</u> previously interviewed by Officer James or perhaps Officer Fillingham, no one ever mentioned that she [Danielle Bell] was having a sexual relationship with Defendant and/or that she may have been pregnant with his child." (Ex. A at 323) (emphasis added).

Petitioner's equivocal, uncorroborated testimony at a motion to dismiss hearing, in the face of testimony from the officers involved in the investigation and documentation corroborating their testimony, was not a sufficient basis for filing a motion to dismiss based upon expiration of the statute of limitations. Therefore, Petitioner failed to satisfy the deferential standard of § 2254(d). Accordingly, he is not entitled to federal habeas relief.

IV.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 2nd day of November 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**